Justice Kagan
delivered the opinion of the Court.
In Padilla v. Kentucky, 559 U. S. 356 (2010), this Court held that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea. We consider here whether that ruling applies retroactively, so that a person whose conviction became final before we decided Padilla can benefit from it. We conclude that, under the principles set out in Teague v. Lane, 489 U. S. 288 (1989), Padilla does not have retroactive effect.
*345 I
Petitioner Roselva Chaidez hails from Mexico, but became a lawful permanent resident of the United States in 1977. About 20 years later, she helped to defraud an automobile insurance company out of $26,000. After federal agents uncovered the scheme, Chaidez pleaded guilty to two counts of mail fraud, in violation of 18 U. S. C. § 1341. The District Court sentenced her to four years of probation and ordered her to pay restitution. Chaidez’s conviction became final in 2004.
Under federal immigration law, the offenses to which Chaidez pleaded guilty are “aggravated felonies,” subjecting her to mandatory removal from this country. See 8 U. S. C. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii). But according to Chaidez, her attorney never advised her of that fact, and at the time of her plea she remained ignorant of it.
Immigration officials initiated removal proceedings against Chaidez in 2009, after an application she made for citizenship alerted them to her prior conviction. To avoid removal, Chaidez sought to overturn that conviction by filing a petition for a writ of coram nobis in Federal District Court.[1] She argued that her former attorney’s failure to advise her of the immigration consequences of pleading guilty constituted ineffective assistance of counsel under the Sixth Amendment.
While Chaidez’s petition was pending, this Court decided Padilla. Our ruling vindicated Chaidez’s view of the Sixth Amendment: We held that criminal defense attorneys must *346 inform non-citizen clients of the risks of deportation arising from guilty pleas. See 559 U. S., at 374. But the Government argued that Chaidez could not benefit from Padilla because it announced a “new rule” and, under Teague, such rules do not apply in collateral challenges to already-finál convictions.
The District Court determined that Padilla “did not announce a new rule for Teague purposes,” and therefore should apply to Chaidez’s case. 730 F. Supp. 2d 896, 904 (ND Ill. 2010). It then found that Chaidez’s counsel had performed deficiently under Padilla and that Chaidez suffered prejudice as a result. Accordingly, the court vacated Chaidez’s conviction. See No. 03 CR 636-6, 2010 WL 3979664 (ND Ill., Oct. 6, 2010).
The United States Court of Appeals for the Seventh Circuit reversed, holding that Padilla had declared a new rule and so should not apply in a challenge to a final conviction. “Before Padilla,” the Seventh Circuit reasoned, “the [Supreme] Court had never held that the Sixth Amendment requires a criminal defense attorney to provide advice about matters not directly related to [a] client’s criminal prosecution,” including the risks of deportation. 655 F. 3d 684, 693 (2011). And state and lower federal courts had uniformly concluded that an attorney need not give “advice concerning [such a] collateral (as opposed to direct) consequenc[e] of a guilty plea.” Id., at 690. According to the Seventh Circuit, Padilla’s holding was new because it ran counter to that widely accepted “distinction between direct and collateral consequences.” 655 F. 3d, at 691. Judge Williams dissented. Agreeing with the Third Circuit’s view, she argued that Padilla “broke no new ground” because it merely applied established law about a lawyer’s “duty to consult” with a client. 655 F. 3d, at 695 (quoting United States v. Orocio, 645 F. 3d 630, 638-639 (CA3 2011); internal quotation marks omitted).
*347 We granted certiorari, 566 U. S. 974 (2012), to resolve a split among federal and state courts on whether Padilla applies retroactively.[2] Holding that it does not, we affirm the Seventh Circuit.
II
Teague makes the retroactivity of our criminal procedure decisions turn on whether they are novel. When we announce a “new rule,” a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding.[3] Only when we apply a settled rule may a person avail herself of the decision on collateral review. Here, Chaidez filed her coram nobis petition five years after her guilty plea became final. Her challenge therefore fails if Padilla declared a new rule.
“[A] case announces a new rule,” Teague explained, “when it breaks new ground or imposes a new obligation” on the government. 489 U. S., at 301. “To put it differently,” we continued, “a case announces a new rule if the result was not dictated by precedent existing at the time the defendant’s conviction became final.” Ibid. And a holding is not so dictated, we later stated, unless it would have been “apparent to all reasonable jurists.” Lambrix v. Singletary, 520 U. S. 518, 527-528 (1997).
But that account has a flipside. Teague also made clear that a case does not “announce a new rule [when] it '[is] *348 merely an application of the principle that governed’ ” a prior decision to a different set of facts. 489 U. S., at 307 (quoting Yates v. Aiken, 484 U. S. 211, 217 (1988)). As Justice Kennedy has explained, “[w]here the beginning point” of our analysis is a rule of “general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.” Wright v. West, 505 U. S. 277, 309 (1992) (concurring in judgment); see also Williams v. Taylor, 529 U. S. 362, 391 (2000). Otherwise said, when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule for Teague purposes.
Because that is so, garden-variety applications of the test in Strickland v. Washington, 466 U. S. 668 (1984), for assessing claims of ineffective assistance of counsel do not produce new rules. In Strickland, we held that legal representation violates the Sixth Amendment if it falls “below an objective standard of reasonableness,” as indicated by “prevailing professional norms,” and the defendant suffers prejudice as a result. Id., at 687-688. That standard, we later concluded, “provides sufficient guidance for resolving virtually all” claims of ineffective assistance, even though their particular circumstances will differ. Williams, 529 U. S., at 391. And so we have granted relief under Strickland in diverse contexts without ever suggesting that doing so required a new rule. See, e. g., ibid.) Rompilla v. Beard, 545 U. S. 374 (2005); Wiggins v. Smith, 539 U. S. 510 (2003).[4] In like manner, Padilla would not have created a new rule had it only applied Strickland’s general standard to yet another factual *349 situation—that is, had Padilla merely made clear that a lawyer who neglects to inform a client about the risk of deportation is professionally incompetent.
But Padilla did something more. Before deciding if failing to provide such advice “fell below an objective standard of reasonableness,” Padilla considered a threshold question: Was advice about deportation “categorically removed” from the scope of the Sixth Amendment right to counsel because it involved only a “collateral consequence” of a conviction, rather than a component of the criminal sentence? 559 U. S., at 365-366.[5] In other words, prior to asking how the Strickland test applied (“Did this attorney act unreasonably?”), Padilla asked whether the Strickland test applied (“Should we even evaluate if this attorney acted unreasonably?”). And as we will describe, that preliminary question about Strickland’s ambit came to the Padilla Court unsettled—so that the Court’s answer (“Yes, Strickland governs here”) required a new rule.
The relevant background begins with our decision in Hill v. Lockhart, 474 U. S. 52 (1985), which explicitly left open whether advice concerning a collateral consequence must satisfy Sixth Amendment requirements. Hill pleaded guilty to first-degree murder after his attorney misinformed him about his parole eligibility. In addressing his claim of ineffective assistance, we first held that the Strickland standard extends generally to the plea process. See Hill, 474 U. S., at 57. We then determined, however, that Hill had failed to allege prejudice from the lawyer’s error and so could not prevail under that standard. See id., at 60. That conclu *350 sion allowed us to avoid another, more categorical question: whether advice about parole (however inadequate and prejudicial) could possibly violate the Sixth Amendment. The Court of Appeals, we noted, had held “that parole eligibility is a collateral rather than a direct consequence of a guilty plea, of which a defendant need not be informed.” Id., at 55. But our ruling on prejudice made “it unnecessary to determine whether there may be circumstances under which” advice about a matter deemed collateral violates the Sixth Amendment. Id., at 60.[6]
That non-decision left the state and lower federal courts to deal with the issue; and they almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction’s collateral consequences, including deportation. All 10 federal appellate courts to consider the question decided, in the words of one, that “counsel’s failure to inform a defendant of the collateral consequences of a guilty plea is never” a violation of the Sixth Amendment. Santos-Sanchez v. United States, 548 F. 3d 327, 334 (CA5 2008).[7] That constitutional guarantee, another typical decision expounded, “assures an accused of effective assistance of counsel in ‘criminal ’prosecutions’ accordingly, advice about matters like deportation, which are “not a part of or enmeshed in the criminal proceeding,” does *351 not fall within the Amendment’s scope. United States v. George, 869 F. 2d 333, 337 (CA7 1989). Appellate courts in almost 30 States agreed.[8] By contrast, only two state courts held that an attorney could violate the Sixth Amendment by failing to inform a client about deportation risks or other collateral consequences of a guilty plea.[9] That imbalance led the authors of the principal scholarly article on the subject to call the exclusion of advice about collateral consequences from the Sixth Amendment’s scope one of “the most widely recognized rules of American law.” Chin & Holmes, *352 Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 706 (2002).[10]
So when we decided Padilla, we answered a question about the Sixth Amendment’s reach that we had left open, in a way that altered the law of most jurisdictions—and our reasoning reflected that we were doing as much. In the normal Strickland case, a court begins by evaluating the reasonableness of an attorney’s conduct in light of professional norms, and then assesses prejudice. But as earlier indicated, see supra, at 349, Padilla had a different starting point. Before asking whether the performance of Padilla’s attorney was deficient under Strickland, we considered (in a separately numbered part of the opinion) whether Strickland applied at all. See 559 U. S., at 364-366. Many courts, we acknowledged, had excluded advice about collateral matters from the Sixth Amendment’s ambit; and deportation, because the consequence of a distinct civil proceeding, could well be viewed as such a matter. See id., at 365, and n. 9. But, we continued, no decision of our own committed us to “appl[y] a distinction between direct and collateral consequences to define the scope” of the right to counsel. Id., at 365. And however apt that distinction might be in other contexts, it should not exempt from Sixth Amendment scrutiny a lawyer’s advice (or non-advice) about a plea’s deportation risk. Deportation, we stated, is “unique.” Ibid. It is a “particularly severe” penalty, and one “intimately related to the criminal process”; indeed, immigration statutes make it “nearly an automatic result” of some convictions. Id., at 365-366. We thus resolved the threshold question before us by breaching the previously chink-free wall between direct *353 and collateral consequences: Notwithstanding the then-dominant view, “Strickland applies to Padilla’s claim.” Id., at 366.
If that does not count as “breaking] new ground” or “imposing] a new obligation,” we are hard pressed to know what would. Teague, 489 U. S., at 301. Before Padilla, we had declined to decide whether the Sixth Amendment had any relevance to a lawyer’s advice about matters not part of a criminal proceeding. Perhaps some advice of that kind would have to meet Strickland’s reasonableness standard— but then again, perhaps not: No precedent of our own “dictated” the answer. Teague, 489 U. S., at 301. And as the lower courts filled the vacuum, they almost uniformly insisted on what Padilla called the “categorica[l] removfal]” of advice about a conviction’s non-criminal consequences— including deportation—from the Sixth Amendment’s scope. 559 U. S., at 366. It was Padilla that first rejected that categorical approach—and so made the Strickland test operative—when a criminal lawyer gives (or fails to give) advice about immigration consequences.[11] In acknowledging that fact, we do not cast doubt on, or at all denigrate, Padilla. *354 Courts often need to, and do, break new ground; it is the very premise of Teague that a decision can be right and also be novel. All we say here is that Padilla’s, holding that the failure to advise about a non-criminal consequence could violate the Sixth Amendment would not have been—in fact, was not—“apparent to all reasonable jurists” prior to our decision. Lambrix, 520 U. S., at 527-528. Padilla thus announced a “new rule.”
Ill
Chaidez offers, and the dissent largely adopts, a different account of Padilla, in which we did no more than apply Strickland to a new set of facts. On Chaidez’s view, Strickland insisted “[f]rom its inception” that all aspects of a criminal lawyer’s performance pass a test of “‘reasonableness under prevailing professional norms’”: The decision thus foreclosed any “categorical distinction between direct and collateral consequences.” Brief for Petitioner 21-22 (quoting Strickland, 466 U. S., at 688; emphasis deleted). Indeed, Chaidez contends, courts prior to Padilla recognized Strickland’s all-encompassing scope and so applied its reasonableness standard to advice concerning deportation. See Brief for Petitioner 25-26; Reply Brief 10-12. She here points to caselaw in three federal appeals courts allowing ineffective assistance claims when attorneys affirmatively misled their clients about the deportation consequences of guilty pleas.[12] The only question left for Padilla to resolve, Chaidez claims, was whether professional norms also require criminal lawyers to volunteer advice about the risk of deportation. In addressing that issue, she continues, Padilla did a run-of-the-mill Strickland analysis. And more: It did an especially easy Strickland analysis. We had earlier noted in INS v. St. Cyr, 533 U. S. 289 (2001)—a case raising an issue of immi *355 gration law unrelated to the Sixth Amendment—that a “competent defense counsel” would inform his client about a guilty plea’s deportation consequences. Id., at 323, n. 50. All Padilla had to do, Chaidez -concludes, was recite that prior finding.
But Chaidez’s (and the dissent’s) story line is wrong, for reasons we have mostly already noted: Padilla had to develop new law, establishing that the Sixth Amendment applied at all, before it could assess the performance of Padilla’s lawyer under Strickland. See supra, at 349, 352. Our first order of business was thus to consider whether the widely accepted distinction between direct and collateral consequences categorically foreclosed Padilla’s claim, whatever the level of his attorney’s performance. We did not think, as Chaidez argues, that Strickland barred resort to that distinction. Far from it: Even in Padilla we did not eschew the direct-collateral divide across the board. See 559 U. S., at 365 (“Whether that distinction is [generally] appropriate is a question we need not consider in this case”). Rather, we relied on the special “nature of deportation”—the severity of the penalty and the “automatic” way it follows from conviction—to show that “[t]he collateral versus direct distinction [was] ill-suited” to dispose of Padilla’s claim. Id., at 365-366. All that reasoning came before we conducted a Strickland análysis (by examining professional norms and so forth), and none of it followed ineluctably from prior law.[13]
*356 Predictably, then, the caselaw Chaidez and the dissent cite fails to support their claim that lower courts “accepted that Strickland applied to deportation advice.” Brief for Petitioner 25; see post, at 366-369. True enough, three federal circuits (and a handful of state courts) held before Padilla that misstatements about deportation could support an ineffective assistance claim. But those decisions reasoned only that a lawyer may not affirmatively misrepresent his expertise or otherwise actively mislead his client on any important matter, however related to a criminal prosecution. See, e. g., United States v. Kwan, 407 F. 3d 1005, 1015-1017 (CA9 2005). They co-existed happily with precedent, from the same jurisdictions (and almost all others), holding that deportation is not “so unique as to warrant an exception to the general rule that a defendant need not be advised of the [collateral] consequences of a guilty plea.” United States v. Campbell, 778 F. 2d 764, 769 (CA11 1985).[14] So at most, Chaidez has shown that a minority of courts recognized a separate rule for material misrepresentations, regardless whether they concerned deportation or another collateral matter. That limited rule does not apply to Chaidez’s case. And because it lived in harmony with the exclusion of claims like hers from the Sixth Amendment, it does not establish what she needs to—that all reasonable judges, prior to Padilla, thought they were living in a Padilla-like world.
Nor, finally, does St. Cyr have any relevance here. That decision stated what is common sense (and what we again *357 recognized in Padilla): A reasonably competent lawyer will tell a non-citizen client about a guilty plea’s deportation consequences because “ ‘[preserving the client’s right to remain in the United States may be more important to the client than any potential jail sentence.’ ” Padilla, 559 U. S., at 368 (quoting St. Cyr, 538 U. S., at 322). But in saying that much, St Cyr did not determine that the Sixth Amendment requires a lawyer to provide such information. Courts had held to the contrary not because advice about deportation was insignificant to a client—really, who could think that, whether before or after St Cyrl—but because it concerned a matter collateral to the criminal prosecution.[15] On those courts’ view, the Sixth Amendment no more demanded competent advice about a plea’s deportation consequences than it demanded competent representation in the deportation process itself. Padilla decided that view was wrong. But to repeat: It was Padilla that did so. In the years following St Cyr, not a single state or lower federal court considering a lawyer’s failure to provide deportation advice abandoned the distinction between direct and collateral consequences, and several courts reaffirmed that divide. See, e. g., Santos- *358 Sanchez, 548 F. 3d, at 335-336; Broomes v. Ashcroft, 358 F. 3d 1251, 1256-1257 (CA10 2004); United States v. Fry, 322 F. 3d 1198, 1200-1201 (CA9 2003). It took Padilla to decide that in assessing such a lawyer’s performance, the Sixth Amendment sets the standard.[16]
{—1 C
This Court announced a new rule in Padilla. Under Teague, defendants whose convictions became final prior to Padilla therefore cannot benefit from its holding. We accordingly affirm the judgment of the Court of Appeals for the Seventh Circuit.

It is so ordered.

 A petition for a writ of coram nobis provides a way to collaterally attack a criminal conviction for a person, like Chaidez, who is no longer “in custody” and therefore cannot seek collateral relief under 28 U. S. C. §2255 or habeas relief under §2241. See United States v. Morgan, 346 U. S. 502, 507, 510-511 (1954). Chaidez and the Government agree that nothing in this case turns on the difference between a corara nobis petition and a habeas petition, and we assume without deciding that they are correct.

 Compare 655 F. 3d 684 (CA7 2011) (case below) (not retroactive); United States v. Amer, 681 F. 3d 211 (CA5 2012) (same); United States v. Chang Hong, 671 F. 3d 1147 (CA10 2011) (same); State v. Gaitan, 209 N. J. 339, 37 A. 3d 1089 (2012) (same), with United States v. Orocio, 645 F. 3d 630 (CA3 2011) (retroactive); Commonwealth v. Clarke, 460 Mass. 30, 949 N. E. 2d 892 (2011) (same).

 Teague stated two exceptions: “[W]atershed rules of criminal procedure” and rules placing “conduct beyond the power of the [government] to proscribe” apply on collateral review, even if novel. 489 U. S., at 311 (internal quotation marks omitted). Chaidez does not argue that either of those exceptions is relevant here.

 We did not consider Teague in Williams, Rompilla, and Wiggins, but we granted habeas relief pursuant to 28 U. S. C. § 2254(d)(1) because state courts had unreasonably applied “clearly established” law. And, as we have explained, “clearly established” law is not “new” within the meaning of Teague. See Williams, 529 U. S., at 412.

 We have never attempted to delineate the world of “collateral consequences,” see Padilla, 559 U. S., at 364, n. 8, nor do we do so here. But other effects of a conviction commonly viewed as collateral include civil commitment, civil forfeiture, sex offender registration, disqualification from public benefits, and disfranchisement. See id., at 376 (Alito, J., concurring in judgment) (listing other examples).

 In saying that much, we declined to rule not only on whether advice about a conviction’s collateral consequences falls outside the Sixth Amendment’s scope, but also on whether parole eligibility should be considered such a consequence, as the Court of Appeals held.

 See Broomes v. Ashcroft, 358 F. 3d 1251, 1256 (CA10 2004); United States v. Fry, 322 F. 3d 1198, 1200-1201 (CA9 2003); United States v. Gonzalez, 202 F. 3d 20, 25 (CA1 2000); Russo v. United States, 1999 WL 164951, *2 (CA2, Mar. 22, 1999); Ogunbase v. United States, 1991 WL 11619, *1 (CA6, Feb. 5, 1991); United States v. Del Rosario, 902 F. 2d 55, 58-59 (CADC 1990); United States v. George, 869 F. 2d 333, 337 (CA7 1989); United States v. Yearwood, 863 F. 2d 6, 7-8 (CA4 1988); United States v. Campbell, 778 F. 2d 764, 768-769 (CA11 1985).

 Rumpel v. State, 847 So. 2d 399, 402-405 (Ala. Crim. App. 2002); Tafoya v. State, 500 P. 2d 247, 252 (Alaska 1972); State v. Rosas, 183 Ariz. 421, 423, 904 P. 2d 1245, 1247 (App. 1995); Niver v. Commissioner of Correction, 101 Conn. App. 1, 3-5, 919 A. 2d 1073, 1075-1076 (2007) (per curiam); State v. Christie, 655 A. 2d 836, 841 (Del. Super. 1994); Matos v. United States, 631 A. 2d 28, 31-32 (D. C. 1993); Major v. State, 814 So. 2d 424, 431 (Fla. 2002); People v. Huante, 143 Ill. 2d 61, 68-71, 571 N. E. 2d 736, 740-741 (1991); State v. Ramirez, 636 N. W. 2d 740, 743-746 (Iowa 2001); State v. Muriithi, 273 Kan. 952, 961, 46 P. 3d 1145, 1152 (2002); Commonwealth v. Fuartado, 170 S. W. 3d 384, 385-386 (Ky. 2005); State v. Montalban, 2000-2739, p. 4 (La. 2/26/02), 810 So. 2d 1106, 1110; Commonwealth v. Fraire, 55 Mass. App. 916, 917, 774 N. E. 2d 677, 678-679 (2002); People v. Davidovich, 463 Mich. 446, 452, 618 N. W. 2d 579, 582 (2000) (per curiam); State ex rel. Nixon v. Clark, 926 S. W. 2d 22, 25 (Mo. App. 1996); State v. Zarate, 264 Neb. 690, 693-696, 651 N. W. 2d 215, 221-223 (2002); Barajas v. State, 115 Nev. 440, 441-442, 991 P. 2d 474, 475-476 (1999) (per curiam); State v. Chung, 210 N. J. Super. 427, 434, 510 A. 2d 72, 76 (App. Div. 1986); People v. Ford, 86 N. Y. 2d 397, 403-404, 657 N. E. 2d 265, 268-269 (1995); State v. Dalman, 520 N. W. 2d 860, 863-864 (N. D. 1994); Commonwealth v. Frometa, 520 Pa. 552, 555-557, 555 A. 2d 92, 93-94 (1989); State v. Alejo, 655 A. 2d 692, 692-693 (R. I. 1995); Nikolaev v. Weber, 2005 S. D. 100, ¶¶11-12, 705 N. W. 2d 72, 75-77 (per curiam); Bautista v. State, 160 S. W. 3d 917, 922 (Tenn. Crim. App. 2004); Perez v. State, 31 S. W. 3d 365, 367-368 (Tex. App. 2000); State v. Rojas-Martinez, 2005 UT 86, ¶¶ 15-20, 125 P. 3d 930, 934-935; State v. Martinez-Lazo, 100 Wash. App. 869, 876-878, 999 P. 2d 1275, 1279-1280 (2000); State v. Santos, 136 Wis. 2d 528, 531, 401 N. W. 2d 856, 858 (App. 1987).

 People v. Pozo, 746 P. 2d 523, 527-529 (Colo. 1987); State v. Paredez, 2004-NMSC-036, ¶¶17-19, 136 N. M. 533, 539, 101 P. 3d 799, 805.

 The dissent is therefore wrong to claim that we emphasize “the absence of lower court authority” holding that an attorney’s failure to advise about deportation violated the Sixth Amendment. Post, at 368 (opinion of Sotomayor, J.). We instead point to the presence of lower court authority—in case after case and jurisdiction after jurisdiction—holding that such a failure, because relating to a collateral matter, could not do so.

 The separate opinions in Padilla objected to just this aspect of the Court’s ruling. Dissents have been known to exaggerate the novelty of majority opinions; and “the mere existence of a dissent,” like the existence of conflicting authority in state or lower federal courts, does not establish that a rule is new. Beard v. Banks, 542 U. S. 406, 416, n. 5 (2004); see Williams v. Taylor, 529 U. S. 362, 410 (2000). But the concurring and dissenting opinions in Padilla were on to something when they described the line the Court was crossing. “Until today,” Justice Alito wrote, “the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the direct consequences of a criminal conviction.” 559 U. S., at 375-376 (opinion concurring in judgment). Or again, this time from Justice Scalia: “[Ujntil today,” the Sixth Amendment guaranteed only “legal advice directly related to defense against prosecution” of a criminal charge. Id., at 389 (dissenting opinion). One need not agree with any of the separate opinions’ criticisms of Padilla to concur with their view that it modified governing law.

 See United States v. Kwan, 407 F. 3d 1005, 1015-1017 (CA9 2005); United States v. Couto, 311 F. 3d 179, 188 (CA2 2002); Downs-Morgan v. United States, 765 F. 2d 1534, 1540-1541 (CA11 1985).

 The dissent’s entire analysis founders on this most basic point. In its lengthy description of Padilla, the dissent picks up in the middle—after the Court concluded that the direct-collateral distinction did not preclude finding that Padilla’s lawyer provided ineffective assistance under the Sixth Amendment. See post, at 361-363. The dissent justifies ignoring that threshold conclusion on the ground that “Padilla declined to embrace the ... distinction between collateral and direct consequences” and “stated very clearly that it found the distinction irrelevant” to the case. Post, at 364. But it is exactly in refusing to apply the direct-collateral distinction that the Padilla Court did something novel. Before then, as the Court forthrightly acknowledged, that distinction would have doomed Padilla’s *356 claim in well nigh every court in the United States. See 559 U. S., at 364-365, and n. 9; supra, at 352.

 See also Resendiz v. Kovensky, 416 F. 3d 952, 957 (CA9 2005) (“[B]e-cause immigration consequences remain collateral, the failure of counsel to advise his client of the potential immigration consequences of a conviction does not violate the Sixth Amendment”); Russo v. United, States, 1999 WL 164951, *2 (“[C]ounsel cannot be found ineffective for the mere failure to inform a defendant of the collateral consequences of a plea, such as deportation” (relying on United States v. Santelises, 509 F. 2d 703, 704 (CA2 1975) (per curiam))).

 The dissent claims the opposite, averring that lower court “decisions show nothing more than that the underlying professional norms had not yet evolved to require attorneys to provide advice about deportation consequences.” Post, at 365-366. But the dissent cannot point to a single decision stating that a lawyer’s failure to offer advice about deportation met professional norms; all the decisions instead held that a lawyer’s breach of those norms was constitutionally irrelevant because deportation was a collateral consequence. See supra, at 350. Had courts in fact considered professional standards in the slew of cases before Padilla that presented Padilla-like claims, they would have discovered as early as 1968 that the American Bar Association instructed criminal lawyers to advise their non-citizen clients about the risks of deportation. See 3 ABA Project on Standards for Criminal Justice, Standards Relating to Pleas of Guilty § 3.2(b), Commentary, p. 71 (App. Draft 1968). The difficulty in upholding such claims prior to Padilla had nothing to do with courts’ view of professional norms and everything to do with their use of the direct-collateral divide.

 Chaidez makes two back-up arguments in her merits briefs—that Teague’s, bar on retroactivity does not apply when a petitioner challenges a federal conviction, or at least does not do so when she makes a claim of ineffective assistance. Brief for Petitioner 27-39. But Chaidez did not include those issues in her petition for certiorari. Nor, still more critically, did she adequately raise them in the lower courts. Only her petition for rehearing en banc in the Seventh Circuit at all questioned Teague’s applicability, and her argument there—that a “Teague-light” standard should apply to challenges to federal convictions—differs from the ones she has made in this Court. See Petition for Rehearing and for Rehearing En Banc in No. 10-3623 (CA7), p. 13. Moreover, we cannot find any case in which a federal court has considered Chaidez’s contention that Teague should not apply to ineffective assistance claims. “[M]indful that we are a court of review, not of first view,” we decline to rule on Chaidez’s new arguments. Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7 (2005).