**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2418
_____

NITA PATEL,
                              Appellant

v.

UNITED STATES OF AMERICA
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:17-cv-07485)
District Judge: Honorable Susan D. Wigenton
_____

No. 23-2795
_____

KIRTISH N. PATEL,
                                        Appellant

v.

UNITED STATES OF AMERICA
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:18-cv-14628)
District Judge: Honorable Susan D. Wigenton
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 8, 2025

Before: HARDIMAN, KRAUSE, and FREEMAN, *Circuit Judges*.

(Filed: October 17, 2025)

Mark E. Cedrone
Aubrey C. Emrich
Saxton & Stump
123 S Broad Street
Suite 2800
Philadelphia, PA 19109

Isabelle Young
Saxton & Stump
151 Meeting Street
Suite 400
Charleston, SC 29401

　　　*Counsel for Appellant Nita Patel in No. 23-2418*

Kirtish N. Patel
14 Harvest Way
Denvile, NJ 07834

*Pro se Appellant in No. 23-2795*

Mark E. Coyne
Steven G. Sanders
Office of United States Attorney for the
District of New Jersey
970 Broad Street
Room 700
Newark, NJ 07102

*Counsel for Appellee in Nos. 23-2418 & 23-2795*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

In *Padilla v. Kentucky*, the Supreme Court held that the Sixth Amendment requires criminal defense lawyers to advise non-citizen clients of the immigration consequences of their guilty pleas. 559 U.S. 356, 374 (2010). In these habeas appeals, Nita Patel and her husband, Kirtish Patel, ask us to extend *Padilla* from the immigration context to civil liability under the False Claims Act. We decline to do so. And even if we were to hold otherwise, retroactive relief would be unavailable to the Patels. *See Edwards v. Vannoy*, 593 U.S. 255, 276 (2021). We

will affirm the District Court's judgment.

I

A

Nita and Kirtish Patel operated Biosound Medical Services Inc. and Heart Solution P.C. Both companies offered mobile diagnostic test services, such as echocardiograms, ultrasounds, and nerve conduction studies to diagnose serious health conditions at a physician's office. To receive reimbursement for those services, Medicare required the companies to have a licensed subspecialist physician on staff to supervise and interpret tests performed in a particular subspecialty.

In 2006, the companies applied to Medicare for approval to do neurological diagnostic testing. Kirtish falsely represented to Medicare that a licensed neurologist would supervise the diagnostic tests. Relying on that falsehood, Medicare approved both companies as providers of neurological diagnostic testing. Starting in 2008, Kirtish—who did not have a medical license or degree—wrote the diagnostic reports, and Nita affixed a forged signature of a physician. This scheme was profitable, earning the Patels at least $4,386,133.75 (of which $1,668,954.95 came from Medicare).

B

In 2014, "Jane Doe," a former employee of the companies, filed a sealed qui tam action in the United States District Court for the District of New Jersey. Doe alleged that the Patels had perpetrated a healthcare fraud scheme and asserted a claim under the False Claims Act, 31 U.S.C. § 3729

4

*et seq.*

Soon after Doe filed the qui tam action, the Patels were arrested on a criminal complaint charging them with conspiring to commit healthcare fraud. The Patels retained separate defense counsel, and each of them agreed to plead guilty to one count of healthcare fraud. *See* 18 U.S.C. § 1347. In exchange, the Government agreed not to file more criminal charges based on the scheme against the couple. Although the parties disputed the exact amount of money the scheme generated, the Patels agreed that it was at least $4,386,133.75. And they acknowledged that they were subject to restitution and criminal forfeiture. Of particular importance to these appeals, the plea agreements were "reached without regard to any civil or administrative matters that may be pending or commenced in the future against" the Patels. App. 175, 184. Nor did the agreements "prohibit the United States . . . or any third party from initiating or prosecuting any civil or administrative proceeding against" them. *Id.*

In November 2015, the Patels pleaded guilty. Nita and Kirtish were later sentenced to 78 months' and 100 months' imprisonment, respectively, followed by three years of supervised release. The District Court also imposed identical restitution obligations and forfeiture judgments against the Patels in the amount of $4,803,875.40.

The day after the Patels pleaded guilty, the Government intervened in Doe's qui tam action and filed a complaint asserting, among other things, claims under the False Claims Act. The Government later moved for summary judgment, arguing that the Patels were collaterally estopped from denying liability because of the stipulations in their plea agreements and the admissions they made in their guilty plea colloquies. The

5

District Court agreed and granted the Government summary judgment on its claims under the False Claims Act. The District Court trebled the Medicare loss of $1,688,954.95 to $5,006,864.85 in damages, plus civil monetary penalties of $2,750,000, for a total of $7,756,864.85. Nita appealed, and we affirmed that judgment as it pertained to her liability under the False Claims Act. *See United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 319–20 (3d Cir. 2019). The parties agreed to stay all efforts to enforce the False Claims Act judgment during the pendency of this litigation.

C

In 2017, Nita moved to vacate her criminal sentence under 28 U.S.C. § 2255. Nita claimed she was unaware of the qui tam action before pleading guilty and her attorney never advised her of the possibility of such civil liability. Nita contended that had she known that her guilty plea could collaterally estop a challenge to her liability in the qui tam action, she would not have pleaded guilty under the agreement.

The District Court denied Nita's § 2255 motion. The Court reasoned that even if defense counsel erred by failing to advise Nita about her potential civil liability, her guilty plea was still knowing and voluntary. In fact, Nita acknowledged during her change of plea hearing that the plea agreement did not preclude the Government from initiating and prosecuting a civil action against her. Referencing defense counsel's pre-plea correspondence with the Patels, the District Court noted that "there [was] evidence the Patels were considering a global resolution during plea negotiations." *Patel v. United States*, 2022 WL 17850147, at *18 (D.N.J. Dec. 22, 2022) (citation modified). The Court held that Nita's § 2255 motion failed "because counsel's performance was not objectively

6

unreasonable under the circumstances as they existed before the plea hearing." *Id.* at *19.

Kirtish also moved to vacate his sentence under 28 U.S.C. § 2255. Like his wife, Kirtish alleged that his lawyer did not advise him that his guilty plea admissions "would have the collateral consequence of estopping him from contesting any claims against him" in the qui tam action. App. 391. Kirtish asserted that had he known about this potential civil liability, he would not have pleaded guilty under the agreement.

The District Court denied Kirtish's § 2255 motion, reasoning that he was told that the plea agreement did not preclude the Government from initiating a civil action based on the same criminal conduct against him. The District Court then held that defense counsel's alleged failure to advise Kirtish of his potential civil liability was not ineffective assistance of counsel.

In 2023, Nita moved to alter or amend the judgment on her § 2255 motion. She argued that she was entitled to an evidentiary hearing because defense counsel rendered ineffective assistance of counsel by failing to advise her of the potential civil liability. Kirtish raised the same arguments in a pro se motion. The District Court denied both motions.

The Patels timely appealed. A panel of this Court granted the Patels a certificate of appealability limited to the claim that counsel provided ineffective assistance by failing to advise them that their guilty pleas could have collateral estoppel consequences in the qui tam action. Nita completed her term of supervised release in January 2025, and Kirtish will complete his term of supervised release in November.

II[1]

To begin, we consider whether Nita's appeal is moot because she has completed her term of supervised release.

Article III of the Constitution limits the "judicial Power" to "Cases" or "Controversies." U.S. Const. art. III, § 2. "For a case or controversy to exist, a petitioner, throughout each stage of the litigation, must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Abreu v. Superintendent Smithfield SCI*, 971 F.3d 403, 406 (3d Cir. 2020) (citation modified). So "a habeas corpus petition generally becomes moot when a prisoner is released from custody because the petitioner has received the relief sought." *Id.* "Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). "We must address the issue of collateral consequences in terms of the likelihood that a favorable decision would redress the injury or wrong." *Abreu*, 971 F.3d at 406 (citation modified).

Nita argues that this appeal is not moot because the judgment from the qui tam action is a continuing collateral consequence of her conviction. We agree. The District Court relied on the collateral estoppel effects of the Patels' guilty pleas to enter judgment in the qui tam action. And a favorable

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 2255 and 2241(a). We review the District Court's legal conclusions de novo and its factual findings for clear error. *United States v. Hill*, 98 F.4th 473, 478 n.1 (3d Cir. 2024).

decision here would permit Nita to reopen that civil judgment. *See* Fed. R. Civ. P. 60(b)(5) (providing that "the court may relieve a party or its legal representative from a final judgment" when "it is based on an earlier judgment that has been reversed or vacated"). So Nita's appeal is not moot because the civil judgment is a continuing collateral consequence from her conviction that could be redressed if she were to prevail. We therefore exercise jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

III

Turning to the merits, the Patels argue that their attorneys provided ineffective assistance of counsel by failing to advise them that liability under the False Claims Act could follow from their guilty pleas for healthcare fraud. We disagree.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel extends to all "critical stages of a criminal proceeding, including when [the defendant] enters a guilty plea." *Lee v. United States*, 582 U.S. 357, 363 (2017) (citation modified). So defense counsel must "inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and constitutional rights that a guilty plea would forgo." *Libretti v. United States*, 516 U.S. 29, 50–51 (1995).

The "right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 US. 759, 771 n.14 (1970) (emphasis added). To show ineffective assistance of counsel in the context of a guilty plea, a petitioner

9

must demonstrate (1) the lawyer's performance was unreasonable under prevailing professional norms; and (2) "there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Before 2010, state courts and the lower federal courts overwhelmingly had held that the Sixth Amendment required that criminal defense lawyers advise their clients only of a guilty plea's direct, rather than collateral consequences. *See Chaidez v. United States*, 568 U.S. 342, 350 & n.7 (2013) (collecting cases). Direct consequences "relate[] to the length or nature of [a] sentence," *Kincade v. United States*, 559 F.2d 906, 909 (3d Cir. 1977), namely, the maximum prison term and any fines for a charged offense. *United States v. Salmon*, 944 F.2d 1106, 1130 (3d Cir. 1991). Collateral consequences have been described as results of a plea that are not "automatic," *Cuthrell v. Dir., Patuxent Inst.*, 475 F.2d 1364, 1366 (4th Cir. 1973), or are beyond the sentencing court's control, "contingent upon action taken by an individual or individuals … such as another governmental agency or the defendant himself." *United States v. Littlejohn*, 224 F.3d 960, 965 (9th Cir. 2000). Thus, we have held collateral consequences to include a conviction's effect on parole eligibility, *Meyers v. Gillis*, 93 F.3d 1147, 1153-54 (3d Cir. 1996), on sentencing for a later offense, *United States v. Rengifo*, 832 F.3d 220, 223 (3d Cir. 2016), and on voting rights, *United States v. Cariola*, 323 F.2d 180, 186 (3d Cir. 1963). *See also United States v. Nicholson*, 676 F.3d 376, 382 (4th Cir. 2012) (employment benefits); *Moore v. Hinton*, 513 F.2d 781, 782 (5th Cir. 1975) (loss of driver's license); *United States v. King*, 618 F.2d 550,

10

552-53 (9th Cir. 1980) (civil tax liability). As of 2010, all ten federal appellate courts to explicitly consider the question had concluded that counsel's failure to advise a client about a guilty plea's collateral consequences was "never [considered] a violation of the Sixth Amendment." *Chaidez*, 568 U.S. at 350 (citation modified).

Neither our Court nor the Supreme Court has directly addressed whether it is appropriate for courts to categorically distinguish between direct and collateral consequences for purposes of defense counsel's Sixth Amendment obligations. Instead, in *Padilla v. Kentucky*, the Supreme Court addressed a more specific question and announced a new rule: that the Sixth Amendment requires "that counsel must inform her client whether his plea carries a risk of deportation." 559 U.S. at 374. Prior to *Padilla*, many lower courts had classified deportation as a collateral consequence. *See, e.g.*, <u>Broomes v. Ashcroft</u>, 358 F.3d 1251 (10th Cir. 2004); <u>United States v. Fry</u>, 322 F.3d 1198 (9th Cir. 2003); <u>United States v. Gonzalez</u>, 202 F.3d 20 (1st Cir. 2000). But in *Padilla*, the Supreme Court explained that it need not address whether the "distinction between direct and collateral consequences [should] define the scope of constitutionally 'reasonable professional assistance' required under *Strickland,*" *id.* at 365, because the "collateral versus direct distinction [was] ill suited to evaluating a *Strickland* claim concerning the specific risk of deportation," *id.* at 366. That was because deportation is "a particularly severe penalty" and "intimately related to the criminal process." *Id.* at 365 (citation modified). According to the Court, the law had "enmeshed criminal convictions and the penalty of deportation for nearly a century." *Id.* at 365–66. "[I]mportantly, recent changes in . . . immigration law ha[d] made removal nearly an automatic result for a broad class of

11

noncitizen offenders." *Id.* at 366. Because of these developments, it was "uniquely difficult to classify [deportation] as either a direct or a collateral consequence." *Id.* The Supreme Court therefore held "that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel," and *Strickland* applied. *Id.*

The Patels do not argue that civil liability under the False Claims Act is somehow a direct consequence of pleading guilty. Instead, they read *Padilla* to establish a broader proposition about collateral consequences. In their view, *Padilla* held "that the constitutional necessity of advising a criminal defendant on the potential consequences of the plea turns on (1) the degree to which the conviction and potential penalty are intertwined, and (2) the severity of the penalty." Patel Br. 21. Not so. In fact, *Padilla*'s holding was limited to requiring "counsel [to] inform her client whether his plea carries a risk of deportation," and it did not apply generally to collateral consequences. 559 U.S. at 374. As one of our sister courts aptly stated: "*Padilla* is rife with indications that the Supreme Court meant to limit its scope to the context of deportation only." *United States v. Reeves*, 695 F.3d 637, 640 (7th Cir. 2012). We read *Padilla* the same way. It did not disturb the lower courts' rules about whether the Sixth Amendment requires attorneys to inform their clients of a conviction's collateral consequences. Instead, it announced that those courts' rules are inapplicable to one specific consequence: deportation. Thus, the Patels' ineffective assistance of counsel claim is not governed by *Padilla*.[2]

---

[2] The Patels argue that the Second Circuit's decision in *Farhane v. United States*, 121 F.4th 353 (2d Cir. 2024) (en banc), supports their argument. That decision held that

We join our sister circuits in holding that the Sixth Amendment requires criminal defense lawyers to advise their clients only of a guilty plea's direct consequences, not its collateral consequences. Therefore, we hold that defense counsel's failure to advise a client about the collateral consequence of civil liability under the False Claims Act does not violate the Sixth Amendment.[3]

IV

The Government argues in the alternative that even if the Patels' Sixth Amendment argument is correct, the non-

"defense counsel has a Sixth Amendment duty to advise a naturalized citizen client that entering a guilty plea exposes him to a risk of denaturalization and deportation" under *Padilla*. *Id.* at 363. Like *Padilla*, *Farhane* hinged on the fact that "the risk of denaturalization" could lead to "deportation." *Id.* at 366. So it does not help the Patels' cases, which have nothing to do with immigration or citizenship.

[3] Even if we were to adopt the Patels' expansive interpretation of *Padilla*, we would hold that *Padilla* does not extend to civil liability arising under the False Claims Act. Unlike civil liability, deportation is "a drastic measure" that is "at times the equivalent of banishment or exile." *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948). The Supreme Court opined in *Padilla* that deportation "is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." 559 U.S. at 364 (footnote omitted). So even under the Patels' own reading of *Padilla*, they have not shown that defense counsel had to advise them of their potential civil liability.

13

retroactivity doctrine of *Teague v. Lane* precludes their requested relief.[4] 489 U.S. 288 (1989). We agree.

Ordinarily, when we "announce a 'new rule,' a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding." *Chaidez*, 568 U.S. at 347. Only a new substantive rule that "alter[s] the range of conduct or the class of persons that the law punishes" applies "retroactively on federal collateral review." *Edwards*, 593 U.S. at 276 (citation modified). "A case announces a new rule . . . when it breaks new ground or imposes a new obligation on the government" because "the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Chaidez*, 568 U.S. at 347 (citation modified). And a holding is not dictated by precedent "unless it would have been apparent to all reasonable jurists." *Id.* (citation modified). By contrast, "a case does *not* announce a new rule[] when it is merely an application of the principle that governed a prior decision to a different set of facts." *Id.* at 347–48 (citation modified).

The Supreme Court's decision in *Chaidez v. United States* is illustrative. There, the Court held that *Padilla* recognized a new rule of constitutional law. *Id.* at 354. Before *Padilla* was decided, many courts "had excluded advice about collateral matters from the Sixth Amendment's ambit." *Id.* at 352. *Padilla* "rejected that categorical approach," making "the *Strickland* test operative" "when a criminal lawyer gives (or

---

[4] The Patels argue that the Government forfeited this argument by failing to raise it until now. Because "we may affirm the District Court for any reason supported by the record," the Government's argument is properly before us. *United States v. Rivera*, 74 F.4th 134, 141 n.37 (3d Cir. 2023) (citation modified).

14

fails to give) advice about immigration consequences." *Id.* at 353. So the *Chaidez* Court held that "*Padilla*'s holding that the failure to advise about [the] non-criminal consequence [of deportation] could violate the Sixth Amendment" was not "apparent to all reasonable jurists prior to" *Padilla*. *Id.* at 354 (citation modified). As a result, habeas petitioners cannot obtain retroactive relief under *Padilla*. *Id.* at 358.

According to the Patels, the non-retroactivity doctrine does not apply because *Padilla* "already answered the question of whether the Sixth Amendment has relevance to a lawyer's advice about matters not part of a criminal proceeding." Reply Br. 17. But as we have explained, the Patels misread *Padilla*'s holding. Because *Padilla*'s holding was limited to deportation, if we were to hold that the Sixth Amendment requires defense counsel to advise a client about potential civil liability under the False Claims Act, we would be recognizing a new rule of constitutional law. Such a holding is not "dictated by precedent existing at the time the" Patels' "conviction[s] became final," so the non-retroactivity doctrine bars their requested relief. *Chaidez*, 568 U.S. at 347 (citation modified); *accord Plunk v. Hobbs*, 766 F.3d 760, 769 (8th Cir. 2014) (en banc) (holding that an extension of *Strickland* to advice about parole eligibility would create "a new rule of constitutional law, inapplicable on collateral review").[5]

---

[5] Because we have held that the Patels failed to "state[] a colorable claim for relief under *Strickland*," we do not reach their argument that the District Court was required to hold an evidentiary hearing. *United States v. Arrington*, 13 F.4th 331, 334 (3d Cir. 2021).

15

\*     \*     \*

For these reasons, we will affirm the District Court's judgment.