COLORADO COURT OF APPEALS                                    2017COA127

Court of Appeals No. 13CA1296
City and County of Denver District Court No. 11CR1007
Honorable John W. Madden IV, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Alfredo Juarez,

Defendant-Appellant.

ORDER AFFIRMED

Division IV
Opinion by JUDGE GRAHAM
Booras and Dunn, JJ., concur

Announced October 19, 2017

Cynthia H. Coffman, Attorney General, Carmen Moraleda, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, John Plimpton, Deputy
State Public Defender, Denver, Colorado; Rachel C. Funez, New Castle,
Colorado, for Defendant-Appellant

¶ 1     Defendant, Alfredo Juarez, appeals the postconviction court's order denying his Crim. P. 35(c) motion seeking to withdraw his guilty plea.  We conclude that Juarez's plea counsel was not ineffective when he advised Juarez that his plea to a class 1 misdemeanor would "probably result in deportation," and, therefore, we conclude Juarez is not entitled to withdraw his guilty plea.  Accordingly, we affirm.

## I.     Background

¶ 2     Juarez is a Mexican foreign national who has lived in Denver since he was approximately six years old.  After graduating from high school, he married a United States citizen, and in 2009 he was granted lawful permanent residence status.  His parents live in Denver, he has two children who are United States citizens, and he has not returned to Mexico at any time prior to his deportation at issue in this case.

¶ 3     In early 2011, the police were called to Juarez's residence after he got into a fight with family members.  Officers were forced to tase Juarez to subdue him and, in a search incident to arrest, cocaine was found in his possession.  Juarez was charged with one felony count of possession of a controlled substance and hired Mr. Tatum

to represent him. At the same time, Mr. Whitehead, an immigration attorney, was also representing Juarez in an unrelated matter concerning his lawful permanent residence status.

¶ 4 Tatum received multiple continuances in the criminal case in an attempt to negotiate a plea with the district attorney that would not result in Juarez's deportation from the United States. Tatum understood that there was no option short of a misdemeanor for less than one ounce of marijuana that would guarantee avoidance of deportation. Ultimately, Juarez pleaded guilty to possession of a schedule V controlled substance, a class 1 misdemeanor, with a stipulated sentence of two years of drug court probation.

¶ 5 During Juarez's April 2012 providency hearing, Tatum informed the court as follows:

> The reason this case has . . . dragged on for a long time is because [co-counsel] and I have spent a lot of time trying to figure out if there was . . . a disposition that would be . . . better for him, immigration-wise.
>
> . . . .
>
> Unfortunately . . . that never occurred. We have . . . at all times advised him that it is our understanding -- although we're not -- I'm not an expert in immigration law, but based on my consultation with immigration attorneys -- that

2

*this plea very likely will result in either deportation or some type of exclusion from the United States.*

He is a legal resident. He does have a green card. But it's fairly well known now that any drug offense other than simple possession of under an ounce of marijuana *will have* negative immigration consequences.[1]

. . . .

I -- *I cannot tell him any stronger. You know, this is a misdemeanor under Colorado state law, but it is the equivalent of a felony under the immigration and naturalization act,* and, you know, I have made him aware of that . . . .

(Emphasis added.)

¶ 6    The court then asked Juarez if he understood "that this plea could . . . affect your immigration status. Do you understand that?"

[Juarez]: Yeah.

The Court: Okay. And even knowing that, do you want to proceed with this disposition today?

[Juarez]: (Indistinguishable.) *There's nothing I can do,* you know. It was -- I don't know. This whole case just was something that should have . . . never really happened, you know. It was all due to my dumb behavior, but, you know, we tried to make it work, *but we can't*

_____

[1] In response to this comment by Tatum, the court stated, "*Or it could.*" (Emphasis added.)

3

> *get it to what we have to*, so we got to go with what . . . we can do now.
>
> . . . .
>
> The Court: Mr. Juarez, understanding all the consequences, both the immigration consequences, the potential that if you violate probation I could sentence you pursuant to what I told you . . . do you still want to . . . take this plea today?
>
> [Juarez]: Yeah.

(Emphasis added.)

¶ 7     The court sentenced Juarez to two years of drug court probation as recommended in his plea agreement.

¶ 8     In May 2012, Juarez tested positive for THC, and the drug court imposed a suspended two-day jail sentence on the condition his THC levels drop.  Because his THC levels did not drop, the drug court imposed the two-day jail sentence in early June.  When Juarez again failed to lower his THC levels in late June, the court imposed a three-day sentence.  During this second period of incarceration, United States Immigration and Customs Enforcement (ICE) placed a hold on Juarez and began deportation proceedings.  An order of removal was entered by the immigration court on September 5, 2012, and Juarez was ultimately deported to Mexico.

4

¶ 9    In October 2012 and January 2013, Juarez filed motions for postconviction relief alleging ineffective assistance of counsel. Juarez argued Tatum failed to advise him that his guilty plea would subject him to (1) mandatory deportation; (2) lifetime inadmissibility to the United States; (3) mandatory detention; and (4) destruction of the defense of cancellation of removal. But for these errors, Juarez alleged, he would not have pleaded guilty and instead would have risked going to trial.

¶ 10    The postconviction court held a hearing over three days in which Tatum, Juarez (via internet connection from Mexico), and Whitehead testified. The testimony of each is summarized below:

- Tatum stated that "immigration was always, I think, the paramount consideration" for Juarez; that he "was aware that the plea agreement proposed by the District Attorney was not acceptable because it would likely get Mr. Juarez deported"; and that "I specifically asked Mr. Juarez if he wanted to take the Class 1 misdemeanor deal that had been offered, and I told him, 'Your immigration attorney advised you that a plea to the Class 1 misdemeanor will probably result in deportation.'"

5

- Juarez testified Tatum and Whitehead told him the plea would make him deportable,[2] but "[t]hey never said you are going to get deported.  They never said you are going to get deported as soon as you are free.  You are going to get deported, they never said that."  Juarez also testified his attorneys never explained that "the misdemeanor plea carried absolutely no benefit over the felony" for immigration purposes; that he "could be subject to mandatory lifetime inadmissibility"; that he could be subject to "mandatory immigration detention"; or that his plea would "destroy[] a defense to deportation."

- Whitehead stated that his general practice at the time was to inform his clients "you are going to probably be placed in removal proceedings or you are going to be facing a permanent bar []to admissibility into the country."  He also stated, "What I remember telling Mr. Juarez . . . was that if he pled guilty to the drug offense

---

[2] Defendant testified, "I know I was pleading guilty to a misdemeanor that would make me deportable according to the information that my lawyer gave me and according to what he knew."

that was being offered to him at the time . . . that he would, 1, probably be placed in remov[al] proceedings and, 2, . . . probably be facing a permanent bar."

¶ 11    After listening to arguments and reviewing the case law on effective assistance to noncitizen defendants, the postconviction court denied Juarez's motion in a written order. The court held:

> [I]n *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473 (2010), . . . the United States Supreme Court found that, under the present immigration laws, deportation is an integral part of the penalty that may be imposed on noncitizen defendants who plead guilty to certain crimes. In doing so, it noted that deportation is a particularly severe penalty, even though it is not technically a criminal sanction. . . . Accordingly, the United States Supreme Court held that, under the Sixth Amendment's guarantee of effective representation, "counsel must inform her client whether his plea carries a *risk of deportation.*" *Id.*, 130 S. Ct. at 1486 (emphasis added). The Supreme Court used this precise language — "risk of deportation" — multiple times in *Padilla.*
>
> . . . .
>
> The Defendant was advised and was aware that his plea carried a risk of deportation. Further, the risk of deportation was correctly quantified as being very likely. As such, the Court finds that the Defendant has not established either prong of the *Strickland* test

and that his attorney did not provide ineffective assistance of counsel.

> The Defendant's attorney, Mr. Tatum, knew early on that the Defendant was a legal resident of this country but was not a citizen. Accordingly, he had an obligation to investigate whether the plea offer made to the Defendant would make the Defendant eligible for deportation. He did this by consulting with an experienced immigration attorney, Lillian Shea, as well as the Defendant's own immigration attorney, Mr. Whitehead. As a result of those consultations, he had a correct understanding that, if the Defendant accepted the plea bargain in this case, he would likely be deported. More importantly in this case, Mr. Tatum also advised the Defendant of this fact. Pursuant to *Padilla*, Mr. Tatum's obligation was to advise the Defendant "whether his plea carrie[d] a risk of deportation," *Padilla*, 130 S. Ct. at 1486, and Mr. Tatum met this obligation.

¶ 12    The court went on to state that Juarez's argument that the advice he received was ineffective because Tatum did not tell him his guilty plea would trigger "the automatic, mandatory and permanent removal provision of deportability" was "an illusory distinction" "contrary to the specific language in *Padilla*." As the court noted, "[t]he only thing the additional language does is create a misleading impression of the probability of actual deportation." Indeed, "whether a person who is deportable will actually be

8

deported is not absolute, certain or guaranteed." Thus, by advising Juarez "that if he took the plea offer in this case he would likely be deported, Mr. Tatum accurately related the effect of the plea under 8 U.S.C. § 1227(a) and also provided additional, correct information as to the probability of deportation which was not explicit under the statute."

¶ 13 The court further held that the "other purported deficiencies" raised by Juarez — failure to advise he would be permanently barred from reentry into the United States, failure to advise his guilty plea would destroy a defense to removal called cancellation of removal, and failure to advise his guilty plea would subject him to mandatory immigration detention without the possibility of bond — do not fall under the ambit of consequences that defense attorneys are required to advise their clients of in order to provide effective representation. "Addressing the first of those purported failures, there is no express requirement in *Padilla* that an attorney must advise a defendant whether his plea will make him inadmissible." And regarding the defense of cancellation of removal and mandatory detention,

[i]f defense attorneys were required to have that degree of familiarity with immigration law, then they would presumably also be required to understand concepts such as withholding of removal, the application of the Convention Against Torture, and exemption from inadmissibility for refugees. . . . [T]he defense position would require an attorney to advise a defendant of a collateral consequence to a collateral consequence.

¶ 14 The court also concluded that Juarez failed to establish prejudice because, "[k]nowing that the best offer he could obtain made him eligible for deportation," Juarez "accepted that risk and took the plea." "He had been advised at least by Mr. Tatum and Mr. Whitehead that if he took the plea bargain he would very likely be deported and that he would be permanently barred from returning to the United States. Knowing these consequences, the Defendant still chose to plead guilty."

> Ultimately, the Defendant's primary desire was to avoid deportation if he could do so. When it became clear that the prosecution would not offer a plea which would avoid that risk and that he would likely lose at trial, he chose what he perceived to be his next best option — avoiding a felony conviction. The decision was a rational one under the circumstances. . . . [I]t strongly appears that the Defendant's decision was motivated by the hope that he might not actually be deported even though he knew this outcome was very likely.

## II. Counsel's Representation Did Not Fall Below an Objective Standard of Reasonableness

¶ 15    On appeal, Juarez first argues that under *Padilla*, Tatum performed deficiently by failing to inform him that he would be subject to "mandatory deportation" if convicted.  Thus, although counsel did inform him that he was "very likely" to be deported, Juarez argues that this advice was deficient because counsel should have told him that his conviction "would absolutely result in deportation" under 8 U.S.C. § 1227(a)(2)(B)(i) (2012).  We disagree and conclude that plea counsel acted within *Padilla*'s objective standard of reasonableness.  To the extent our holding conflicts with the division in *People v. Campos-Corona*, 2013 COA 23, we decline to follow that opinion as an untenable expansion of *Padilla*. *See People v. Delgado*, 2016 COA 174, ¶ 27 (one division of the court of appeals is not bound by the decision of another division in a different case).

### A.    Standard of Review

¶ 16    An appeal from an order denying a claim of ineffective assistance of plea counsel presents a mixed question of law and fact.  We defer to the postconviction court's findings of fact if

supported by the record, and we review the conclusions of law de novo. *People v. Stovall*, 2012 COA 7, ¶ 18.

### B. Law

¶ 17    "The Sixth Amendment guarantees a defendant the effective assistance of counsel at 'critical stages of a criminal proceeding,' including when he enters a guilty plea." *Lee v. United States*, 582 U.S. ___, ___, 137 S. Ct. 1958, 1964 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012)).  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-pronged test to determine whether a criminal defendant is entitled to relief as a result of constitutionally deficient representation.  "To demonstrate that counsel was constitutionally ineffective, a defendant must show that counsel's representation 'fell below an objective standard of reasonableness' and that he was prejudiced as a result."  *Lee*, 582 U.S. at ___, 137 S. Ct. at 1964 (quoting *Strickland*, 466 U.S. at 688, 692).

¶ 18    A defense attorney must advise a noncitizen defendant about potential immigration consequences to his or her plea:

> When the law is not succinct and
> straightforward . . . a criminal defense attorney
> need do no more than advise a noncitizen

12

client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear . . . the duty to give correct advice is equally clear.

*Padilla*, 559 U.S. at 369 (footnote omitted). Under 8 U.S.C. § 1227(a)(2)(B)(i), "[a]ny alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State . . . relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable."

¶ 19　　"The severity of deportation — 'the equivalent of banishment or exile,' *Delgadillo v. Carmichael*, 332 U.S. 388, 390-91, 68 S. Ct. 10, 92 L. Ed. 17 (1947) — only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation." *Padilla*, 559 U.S. at 373-74. Therefore, "the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea." *Chaidez v. United States*, 568 U.S. 342, 344 (2013).

## C.　Analysis

¶ 20　　We read *Padilla*'s requirement that a defense attorney give "correct advice," *Padilla*, 559 U.S. at 369, as a requirement to give

advice that informs his or her client "about the *risk* of deportation arising from a guilty plea." This advice need not be unequivocal, and it does not require counsel to tell a defendant that his plea will subject him to "mandatory removal," "presumptively mandatory deportation," or "automatic or mandatory deportation." We reach this conclusion because, although a noncitizen defendant is deportable for a controlled substance conviction under 8 U.S.C. § 1227(a)(2)(B)(i), deportation is not guaranteed. *See State v. Shata*, 868 N.W.2d 93, 108 (Wis. 2015) ("Although a controlled substance conviction makes an alien 'deportable,' 8 U.S.C. § 1227(a)(2)(B)(i), such a conviction will not necessarily result in deportation.").

¶ 21    As noted by Whitehead at the postconviction hearing:

> [In] my 40 years of [practicing] immigration [law] I learned there is nothing absolutely . . . certain or guaranteed with the immigration service. And just because a person may be mandator[ily] subject to it doesn't necessarily mean they will automatically be placed in proceedings.
>
> ICE takes a look at a case -- on a case by case basis as do the trial attorneys with the government. And just because the statute calls for something doesn't necessarily mean they'll automatically do it. There is a likelihood they will do it. But if you are telling somebody there is a guarantee something is

14

> going to happen within the immigration
> confines it may not happen.

Indeed, "the executive branch has essentially unreviewable prosecutorial discretion with respect to commencing deportation proceedings, adjudicating cases, and executing removal orders." *Id.* (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482-85 (1999)).

¶ 22    Tatum not only advised Juarez of the risk of deportation, he quantified it by stating that it was "probable"[3] and that drug offenses "will have" negative consequences. Indeed, Juarez understood these warnings to mean that "[t]here [was] nothing [he] c[ould] do" because he could not get a plea deal "to what [I] have to."

¶ 23    In addition, removal proceedings for Juarez began only after he thrice violated the terms of his drug court probation. Once he was confined in county jail for violating his probation, ICE placed a hold on him and began removal proceedings. This raises the question of whether such a proceeding would have been initiated

---

[3] Webster's Third New International Dictionary 1806 (2002) defines "probable" as "that almost certainly is or will prove to be something indicated."

had Juarez not violated his probation, resulting in his incarceration. When viewed in this context, Tatum's advice to Juarez correctly conveyed that the risk of deportation was "very likely" and "probable," and that his guilty plea would have adverse consequences. *See Commonwealth v. DeJesus*, 9 N.E.3d 789, 799 (Mass. 2014) (Cordy, J., dissenting) ("There was no inaccuracy or soft pedaling of advice here."); *Shata*, 868 N.W.2d at 111 (The defendant's "attorney gave him advice that there was a 'strong chance' of deportation, which was absolutely correct. Correct advice is not deficient.").

¶ 24 We acknowledge that a majority of jurisdictions have interpreted *Padilla* as requiring counsel to inform a noncitizen defendant that conviction for a deportable offense will either result in deportation or subject a defendant to "mandatory deportation." *United States v. Al Halabi*, 633 F. App'x 801, 803 (2d Cir. 2015) ("[W]here the law clearly dictates that removal is presumptively mandatory, a defense attorney's failure to advise his client of that fact falls below an objective standard of reasonableness."); *United States v. Rodriguez-Vega*, 797 F.3d 781, 786 (9th Cir. 2015) ("[W]here the law is 'succinct, clear, and explicit' that the conviction

16

renders removal virtually certain, counsel must advise his client that removal is a virtual certainty." (quoting *Padilla*, 559 U.S. at 368-69)); *United States v. Urias-Marrufo*, 744 F.3d 361, 365 (5th Cir. 2014) ("[D]efense counsel has an obligation under the Sixth Amendment to inform his noncitizen client 'that the offense to which he was pleading guilty would result in his removal from this country.'" (quoting *Padilla*, 559 U.S. at 360)); *United States v. Akinsade*, 686 F.3d 248, 254 (4th Cir. 2012) ("[T]he admonishment did not 'properly inform' Akinsade of the consequence he faced by pleading guilty: mandatory deportation."); *Budziszewski v. Comm'r of Corr.*, 142 A.3d 243, 246 (Conn. 2016) ("In circumstances when federal law mandates deportation and the client is not eligible for relief under an exception to that command, counsel must unequivocally convey to the client that federal law mandates deportation as the consequence for pleading guilty."); *Hernandez v. State*, 124 So. 3d 757, 760, 762 (Fla. 2012) (Where counsel informed the defendant a plea "could/may" affect his immigration status, "Hernandez's counsel was deficient under *Padilla* for failing to advise Hernandez that his plea subjected him to presumptively mandatory deportation."); *Encarnacion v. State*, 763 S.E.2d 463,

466 (Ga. 2014) ("An attorney's advice as to the likelihood of deportation must be based on realistic probabilities, not fanciful possibilities. . . . [W]e find that where, as here, the law is clear that deportation is mandatory and statutory discretionary relief is unavailable, an attorney has a duty to accurately advise his client of that fact. It is not enough to say 'maybe' when the correct advice is 'almost certainly will.'") (citation omitted); *DeJesus*, 9 N.E.3d at 794 ("We conclude that advising a defendant faced with circumstances similar to those in this case that he is 'eligible for deportation' does not adequately inform such a defendant that, if he were to plead guilty . . . then, upon apprehension, his removal from the United States would be presumptively mandatory under Federal law."); *Salazar v. State*, 361 S.W.3d 99, 103 (Tex. App. 2011) ("[T]he correct advice, which was that the plea of guilty would result in certain deportation, was not given. Both the terms 'likelihood' and 'possibility' leave open the hope that deportation might not occur. Consequently, these admonishments were inaccurate . . . ."); *State v. Sandoval*, 249 P.3d 1015, 1019 (Wash. 2011) ("If the applicable immigration law 'is truly clear' that an offense is deportable, the defense attorney must correctly advise the defendant that pleading

18

guilty to a particular charge would lead to deportation." (quoting *Padilla*, 559 U.S. at 369)); *see Campos-Corona*, ¶ 13 ("Because Campos-Corona was not advised of mandatory removal, we conclude that the postconviction court erred in finding counsel's performance was reasonable.").

¶ 25  We think that the advice given by Tatum meets the general spirit of that standard.  But if it does not, we nevertheless see no fault in it.  We cannot say that counsel's advice must be couched in terms of absolute certainty or must incorporate talismanic language.  Consequently, we find more persuasive cases in those jurisdictions that have concluded that because deportation is not automatic after conviction for a deportable offense, *Padilla* does not require an attorney to advise a client that he will, with 100% certainty, be deported.  *Chacon v. State*, 409 S.W.3d 529, 537 (Mo. Ct. App. 2013) (holding defense counsel's advice that the defendant would "very likely be deported and wouldn't be able to come back" was constitutionally effective assistance); *Commonwealth v. Escobar*, 70 A.3d 838, 842 (Pa. Super. Ct. 2013) ("We do not read the statute [8 U.S.C. § 1227] or the [*Padilla*] court's words as announcing a guarantee that actual deportation proceedings are a

19

certainty such that counsel must advise a defendant to that effect."); *Neufville v. State*, 13 A.3d 607, 614 (R.I. 2011) ("Counsel is not required to inform their clients that they *will* be deported, but rather that a defendant's 'plea would make [the defendant] eligible for deportation.'" (quoting *Padilla*, 559 U.S. at 368)) (alteration in original); *Shata*, 868 N.W.2d at 109 ("Because deportation is not an absolutely certain consequence of a conviction for a deportable offense, *Padilla* does not require an attorney to advise an alien client that deportation is an absolute certainty upon conviction of a deportable offense, including a controlled substance offense."); *see DeJesus*, 9 N.E.3d at 799-800 (Cordy, J., dissenting) ("[D]eportation has not been demonstrated to be inevitable in the aftermath of every plea of guilty that creates either 'eligibility' or even a 'presumption' of deportation. . . . [T]he deportation proceeding is contingent on there being an 'order' of removal from the Attorney General of the United States, and there still remain discretionary avenues to avoid deportation, albeit limited ones."). Instead, we conclude, taking into account the language counsel actually uses and the circumstances of the noncitizen client (such as the ability to read and understand English), a criminal defense attorney may

20

provide effective assistance even when using equivocal terms such as "likely," "strong chance," or "probably."

> The *Padilla* Court ultimately "[held] that counsel must inform her client whether his plea carries a *risk* of deportation." *Padilla*, 559 U.S. at 374, 130 S. Ct. 1473 (emphasis added). The Court did *not* hold that an attorney must inform an alien client that a conviction for a deportable offense will absolutely result in deportation. The Court did not require an attorney to use any particular words, such as "inevitable deportation," or to even convey the idea of inevitable deportation.

*Shata*, 868 N.W.2d at 98 (alteration in original).

¶ 26    In *Campos-Corona*, a division of this court held that while both counsel and the trial court advised the defendant "his plea could, or likely would, result in deportation and difficulty re-entering the United States," ¶ 12, "[b]ecause Campos-Corona was not advised of mandatory removal," ¶ 13, the postconviction court erred in finding counsel's performance reasonable. But the division summarily reached this conclusion in two paragraphs with little discussion or analysis of *Padilla* and the concomitant case law. In any event, had the division considered the above-mentioned case law and reached the same conclusion, we would respectfully disagree. Indeed, we would have concluded that counsel's advice that "a guilty plea

21

would make renewing [Campos-Corona's] permanent residence status difficult, if not impossible, and that he would likely be deported," *id.* at ¶ 3, was not constitutionally deficient.

¶ 27     The record supports the postconviction court's findings that Juarez was correctly advised and fully understood the risk of his plea prior to pleading guilty.  Given Juarez's acknowledgment that he knew he could not reach a plea that would prevent his deportation, plus the multiple layers of advice he received (including inquiry by the court regarding immigration consequences prior to accepting his guilty plea), we are satisfied that Tatum provided constitutionally effective representation.  As stated by the Wisconsin Supreme Court, "[t]he bottom line is that an attorney's advice must be adequate to allow a defendant to knowingly, intelligently, and voluntarily decide whether to enter a guilty plea." *Shata*, 868 N.W.2d at 107.  The advice Juarez received from Tatum allowed him to do so.  The fact that Juarez's subsequent behavior resulted in his incarceration and eventual deportation does not make the advice given by his counsel constitutionally ineffective.

### III. Additional Contentions

¶ 28    Juarez goes on to argue that Tatum was required to advise him that his guilty plea would result in lifetime inadmissibility to the United States, mandatory detention, and destruction of the defense of cancellation of removal.[4]  We find no support for these arguments in the language of *Padilla*.  Indeed, the *Padilla* Court said "[i]mmigration law can be complex, and it is a legal specialty of its own" in which "the deportation consequences of a particular plea are [often] unclear or uncertain."  559 U.S. at 369.  *Padilla* does not require criminal defense attorneys to function as immigration lawyers.  Juarez's arguments to the contrary expand *Padilla* past any commonsense reading.  *See People v. Vicente-Sontay*, 2014 COA 175, ¶ 38 ("[The defendant] cites no authority . . . nor have we seen any, requiring counsel to advise a defendant on the particulars of cancellation of removal when the defendant's eligibility for such relief is unclear.").

---

[4] We note, as did the postconviction court, that the defense of cancellation of removal was not available to Juarez because he was not a lawful permanent resident of the United States for five years prior to his arrest and conviction in this case.  *See* 8 U.S.C. §§ 1182(a)(2), 1229b(b)(1)(C) (2012); *accord People v. Vicente-Sontay*, 2014 COA 175, ¶¶ 37-38.

¶ 29     Because we conclude that counsel's performance was "within the range of competence demanded of attorneys in criminal cases," *Strickland*, 466 U.S. at 687 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)), we need not consider whether counsel's deficient performance prejudiced Juarez in this case.

## IV.   Conclusion

¶ 30     The order is affirmed.

JUDGE BOORAS and JUDGE DUNN concur.